K.I.C. terminated Becker's employment because he questioned whether or not his hiring preference because he questioned whether or not his hiring preference because he questioned whether or not his hiring preference was discriminated on the basis of race at the district court this case was decided on summary judgment with the district court essentially holding that Becker could not establish that he engaged in protected activity we argue in response to whether Becker engaged in protected activity is at the very least a fact issue that should be resolved at trial. What's the protected activity that Becker claimed he engaged in? He complained that K.I.C. had a hiring policy that discriminated on the basis of race. And he said, I've been hiring shareholder people who are entitled to be hired under the shareholder preference who are Caucasians and I've been disciplined and then fired for having hired those people which says to me, said Becker, that in fact what they're doing is under the cover of a shareholder preference, implementing a natives only preference. But it turns out that the three people he says he was entitled to, the three Caucasians he says he was entitled to hire under the shareholder preference were not in fact proper under the shareholder preference the district court found it. Did the district court make a mistake is to say were those three people, Moo, Collins and Likens, were they properly hired under the shareholder preference? Yeah, what the district court, where the district court's error was, was that this was a hiring preference and none of those people were hired at the exclusion of a shareholder or a native Alaskan or anyone else. I want to make sure we're on the same page. None of these people in fact was a qualified person under the shareholder preference. They had to be hired even though they got no preference, is that correct? They were, yeah, they were hired. Well, first of all, I don't think he hired them, but if he hired them, he supervised them, but he hired them. I thought the record says he hired those three. I think it was he was supervising these people, but even if he were to hire them, the preference only, his understanding of the preference was that it was a preference that came into play only if he had two applicants and he had to choose between those two applicants. And that's what his question was about, was whether this was a hiring preference or a prohibition against hiring non-shareholders, non-native Alaskans. And I think that's where the district court got confused, is that it looked at a hiring preference that said if, you know, for all legal purposes, you know, for whatever purposes it's legal, you have two applicants applying for the job. You are required to choose the KIC shareholder, spouse, descendant, a NANA shareholder, or any other native shareholder, and then native preference is given in all selections. So what Doug Becker argued was that he never violated that shareholder preference because he was always looking for employees, so he took whatever employees applied for the job. And so there was never an occasion when he had to select between a shareholder or, you know, a shareholder for KSC or of NANA. I got it. Now, I just went back and looked at his affidavit. You properly corrected me. He did not hire these three people. They were already there. And I gather what he did was he complained that they had been improperly hired because, in his view, it showed that there was, in fact, a natives-only policy. Now, what happened was it gets a little confusing, and I think the district court got confused as well. What happened was he was required to submit a quota of how many people were shareholders or how many people fit under their definition of shareholders. So he listed them as someone who fit under the preference, but, see, it's a hiring preference, so they wouldn't fit under the hiring preference if he never hired them. And so what he was getting flack about was the fact that he was supervising people who weren't shareholders and who weren't NANA shareholders and some who weren't even Alaskan natives. And so what he did, what his protected speech was, was to say, I've never violated the shareholder hiring preference. Anytime a shareholder comes, anytime an Alaskan native comes, anytime they come, I hire them. All I did was hire a single Caucasian. He hired a single Caucasian employee by the name of Keith, and he was getting complaints by the board, why did you hire this person? You shouldn't have hired him, and so that's when his question was, he was saying, is this a hiring preference or a hiring prohibition? A prohibition against hiring non-natives. And really where his, the reason why he was questioning was because, you know, he thought he was following this hiring preference. But it never came into play. But he was getting attacked for having merely hired a single Caucasian employee. And that's what the district court, one of the main errors that we see is that they continually say he violated the policy. Doug Becker violated the policy, but there was no evidence produced that he violated the hiring preference. Because all it does, you know, and this is where the district court makes critical confusion, is that it says you violated the hiring preference because you hired a Caucasian, you know, a Caucasian employee. But hiring a Caucasian employee when no one else is applying shouldn't violate any hiring preference. Counsel, I'd appreciate your explanation of something. My take of this case is whether your client can show that he reasonably believed that there was, in fact, some illegality occurring here. Under the McDonnell-Douglas standard, he has to put forward a prima facie case. The district court obviously didn't find that to be the case. Because the allegations that he met, in fact, dealt with people who were shareholders, and that wasn't an issue. Or parents, I think, of shareholders. And what did he reasonably believe to have been the protected activity that was violated here? Now, he reasonably believed that KSC was instituting a racial prohibition in hiring that prohibited him from hiring non-Alaskans to his job. And he relied upon what? He relied on the board's confusion, the interchangeability between a hiring preference that preferred Native Alaskans and shareholders to the fact that he hired a Caucasian employee. And so he was told, hey, you violated this policy. And his response was, the policy is a preference. Just like in tech versus Alaskan, that was a preference. And this court, it was an unpublished decision, but this court said a preference means a selection between two otherwise equally qualified employees. Well, never was that an issue. And it was never proven in any, there's been no record produced that he violated that policy. And yet he was terminated for not following the shareholder hiring preference. This is where things somewhat are out of order from my perspective. Is it your perspective that if we were to send this back, the next step would be that the, what are we calling it, KIC, would have the opportunity to show that there is legitimate business reasons for what they did. They would point that, obviously, it would be perfectly lawful to hire shareholders, give preference to shareholders and the like. So then you come back and your client's got to show that the whole thing is pretext. What, is there anything in the record that shows that he can bear out his position on the third strong example? Sure, well, you know, I think that we don't even need to get to McDonald's if there's direct evidence of discriminatory or retaliatory intent. And we have a clear statement from KIC that we terminated him for not following the shareholder preference. Well, that's the business response. That's the second problem. Yeah, that's right. We're just saying, hey, you know, what we did here was perfectly lawful. You know, we hired this guy, we told him to do certain things, he didn't do it. He said we were doing something wrong, we weren't. That's where we are in this suit, right? Yeah, and I think he can clearly prove that, I mean, the evidence that he submitted and, I mean, basically they're asking him to prove something that never, to verify that nothing ever happened. His statement is, you know, and he can go through all the hiring people. None of these people were hired in violation of the shareholder hiring preference. So, therefore, their state of reason, just like in Reeves v. Sanderson, their state of reason is lax credence. They didn't fire him for following, for not following the shareholder hiring preference. They fired him for some other reason, and his implication was that they actually instituted a racial prohibition against hiring non-natives, and that on its face should clearly be discriminatory. He's on the reasonably believed stand, why is he reasonably believed? Yeah, and he's a manager, remember, so it's not like he said, you guys have a policy that says I have to pay overtime to non-exempt employees, I think this is illegal. It's more along the lines of, they had a policy that said you cannot pay overtime to non-exempt employees, and he said, whoa, I don't know why that would be something I'm able to do, and then they fire him for that. And Moyo v. Gomez, that was the key thing. If you had a conflict, even if you make an allegation that something was done illegally, even if you're incorrect as to the law, so if he said this violated Title VII, and they come back and say, whoa, as was the case in Moyo, they said prison inmates are not employees. Where here if they said, well, our people aren't considered employees under Title VII, that still would be a mistake as to the law, but here he's alleging that it violates 1981. But also, Malibet, I think this court also decided that in the Malibet case, that these racial preferences, that Malibet was on a state action, but that was held to strict scrutiny, and that was struck down. Help me out again. I'm having trouble pinning down what exactly it is that Mr. Becker thought was illegal about the hiring practices of KIC. What was it that precisely he was complaining about that he says was illegal? Was that he was required to, there was a prohibition against him hiring non-Native Alaskans or non-shareholders. It wasn't a hiring preference, but it was you hired somebody who wasn't an Alaskan Native or wasn't a shareholder. So he questioned, and what he did was question, what exactly is this policy? You say it's a shareholder preference. I'm following the preference. So point me to the record. Where is it that he says exactly what it is that he complained about that was illegal? I believe in the record it points out the conversation that he had in the end between him, right after he got terminated, or actually right before he got terminated, he had a conversation with, I think it was Harold Lambert of the KSC board in 2007, and he was at that meeting questioning whether or not he had, you know, why he hired Keith, and he said is this, and that's when he questioned the president, is this policy really just a euphemism for Native-only hiring? I'm on page 3 of his affidavit. I'm reading kind of paragraphs 8 through 12. It's on ER 48. Are you with me? Yes. So I'll just read it. It's a little bit long, but there's enough complication in here. I think I want to make sure I read it right. Just starting with paragraph 8. During the May 21, 2000 board meeting, I learned that some of the shareholders I had classified as shareholders were not counted as such by KSC's board because they were not Native Alaskans. I had suspected up until this time that the shareholder preferential hire policy seemed to be merely a Native-only hiring policy. After the May 21, 2000 board meeting, I met with Tim Schirch and told him that the shareholder policy seemed more like a euphemism for Native-only policy. I told Mr. Schirch that I thought it was wrong. The way that KSC implemented a shareholder Native hiring policy objected that the policy seemed discriminatory. As of May 2007, I supervised 14 employees as manager of KSC HAL. Of these 14, only one employee was a Caucasian and not a shareholder per the definition established by KSC. As of May 2007, two of my employees were Caucasian and also classified as shareholder eligible for preferential hiring. Then he says Ronnie Moo and Tammy Collins. And then he says a third employee, Chase Lykins, fathered a child with a KSC holder, making him a father of a shareholder. At the board meeting on May 21, I informed members that Ronnie Moo and Tammy Collins, both Caucasian, were shareholders per KSC's definition. I also informed Tim Schirch that these two employees were shareholders. Well, it sounds to me as though in this affidavit he's saying I was fired because I complained about this illegality. But it turns out that it was not an illegality. It turns out, as the district court found, that this was not an illegality, that in fact these people were Caucasians, not subject to shareholder preference. So he's wrong. Yeah, well, no. I think that the, remember, May 21 was the time when he also mentioned that he thought this shareholder hiring preference was a euphemism for native only hire. So the reason why that came up was because the only person that he hired, the question that was raised about was whether or not Keith was hired in violation of shareholder policy. These other ones were dealing with how they marked whether or not somebody was a shareholder or whether or not somebody fit into the category. Right, but paragraph eight on, he's just saying that I complained to them that in fact what they were doing was a native only policy, and it turns out he's wrong. I mean, all the facts of these things. None of these was a shareholder. Yeah, but none of them were hired pursuant to the shareholder policy because, first of all, he didn't hire any of them. He just supervised them, and so it's a shareholder hire. The only person that he hired that there was a question about was Keith. Where does he say that he's fired because he hired Keith? I think in the pleading we mentioned frequently that that was what the question was, was about the single Caucasian. I don't know if it's in this. Yeah, well, in paragraph five he says Sally Mountain called him, questioning him whether he was following the hiring policy because he hired him. He doesn't name Keith. Yeah, but that's the single Caucasian that he had hired. So he was saying, you know, how can I have violated the shareholder preference? And that's what he made a, we argue that he made a valid legal inquiry into how KIC was implementing this hiring preference when he was receiving questions about hiring. I mean, it wasn't a competition application. The record illustrates it. He was constantly asking for people to hire. So he was hiring whoever put in an application. He wasn't saying, I'm not hiring you because you're Caucasian. Okay, listen, we've taken you well over. Let's hear from the other side and we'll give you a chance to respond. Thank you, Your Honors, and may it please the Court, my name is Scott Broadwell representing KIC in this case. The question before the Court today is simply, has Mr. Becker met his burden of producing a prima facie case of retaliation in 1981? Certainly the District Court held he did not, and we urge the Court here today to affirm that holding. Let me ask you this, Counsel, since the standard is reasonably believed, if it turns out he was wrong but he believed it, how do we get to the determination of what was reasonable? Was it based upon his level of education? Was it based upon what he observed? What's the standard? The standard, as I understand it, is an objective standard. Taking all due consideration for a typical employee isn't necessarily going to be an attorney or somebody in that case. It would still be an objective standard. And here, certainly looking at the record and the evidence in the record, the evidence supports, no matter who is in that position, that his belief was simply unreasonable. He admits he never read or saw the policy prior to initiating it. Is this the employee handbook you're talking about, or this is some other document? This is some other document. It's on the record, the hiring preference. Well, you know, I think you're talking about mission number two? Yes, Your Honor. The question is, please admit that during your employment you received a copy of the shareholder hiring preference produced as part of the defendant's initial disclosures and identified by Bates number, da, da, da. Denied. I have never seen this document. That's pretty narrow. That's not a statement. I've never read the policy. The policy isn't in print anywhere else, and that is the policy. Well, this is, you received a copy produced as part of the, I have trouble seeing that as I did not understand the policy. I'd never read it. I mean, this is quite narrow. I understand, Your Honor, and, you know, that's only one component of the reasonableness argument in any case. The other really is. Because he seemed to have a fairly good understanding of at least the general contours of the policy. I would argue he did not have a good understanding of the general contours of the policy based largely on the evidence he brought forward in the district court as to why he considered the policy to be a proxy for race, and that would really be those three employees that, you know, he said, look, these are all subject to shareholder hiring preference. They're, you know, non-Alaska natives. Therefore, this is a proxy for race. But in the end, you know, you look at each of those employees, not a single one of them did the policy actually apply to, and he didn't understand the contours of the hiring preference. And, you know, so there is evidence on the record that really, no, he did not understand this preference. And, you know, he hadn't seen the document, even if we do construe that narrowly. He wasn't questioning KIC. Okay, well, management's been admonishing me about my implementation of this policy. You know, could you please explain it to me? Who is covered by the policy? Who isn't covered by the policy? And he jumped to the conclusion that this was a racial proxy, but without ever, you know, really probing what the policy itself is. Following on my earlier question about what does reasonably believe constitute, I jotted down a few things that it seemed to me might have colored his view, and I'd appreciate your telling me whether any of these makes no sense at all. One of them is the KIC employee handbook that states that, in quotes, that native preference is given in all hiring acts. Could that be considered in our determination? I don't think so, Your Honor. Certainly Mr. Becker argues as much in the briefing that, well, they say right there, native, but, however, that phrase kind of two points. You think that should not count? Well, two points, if I may. But, you know, I think that phrase needs to be read in context of the rest of that statement. Where right before it, you know, this KIC says, shareholder hiring preference is important, and right after it says shareholder hiring preference is 90%. You know, native is a technical term that gets used, you know, frankly in a confusing manner at times. You know, does this mean native from a racial sense? Does this mean a shareholder of a native corporation? And certainly within the context of that statement, it's, you know, blocked by both statements as to shareholder. Okay. Here's a second thing. In a meeting two weeks after Becker began work, KIC attended a meeting to discuss the, end quote, shareholder and native hiring preference. Do we consider that? Well, that was Mr. Becker's, you know, characterization. I understand that. That's what he alleges occurred. Yeah, and I think that, again, is kind of shows that native, you know, gets used inartfully oftentimes. That was recognized in the Connick's opinion. Certainly the judge in that opinion, you know, mentioned, well, you know, the case was confused by the fact that, you know, Alaska native hire, shareholder hire oftentimes get used interchangeably. And I think that's what's happening. Here's another one. Becker, when he hired a Caucasian human resources officer, became angry about Becker not following the policy. Is that an indication? No, again, I'd say no, Your Honor. It's, you know, shareholder hire is very important to KIC as it is to, you know, most Alaska native corporations. Certainly if human resources sees a non-shareholder coming up, they're going to want to ask, you know, come down and ask, right, well, were there shareholder applicants? You know, so that's their simply questioning of it isn't. Okay. I'm just trying to get your views on these. Sure. There are three more. When some non-Alaska native employees were not subject to the shareholder preference, Becker believed that KIC reclassified them because of their race. Could that be considered? Well, the evidence on the. You're talking about how the business would respond in the second prong of McDonald. I'm just asking, on a prima facie case basis, these are some of the things that he indicated. Sure. Should they just be thrown out or whatever? Well, those employees that he mentions were those three employees that the evidence showed weren't subject to shareholder preference. Okay. All right. How about this one? The request of KIC management, Becker kept track of the races of his employees and identified whether they were shareholders or, in quotes, We don't see on the record where that ever occurred. There were certainly shareholder hiring statistics that were kept. And finally, every employee subject to the shareholder agreement was, in fact, an Alaska native. Did that count in any way? No, I don't think so, Your Honor, because statistically, the fact of the matter is the vast majority of shareholders are going to be racially Alaska natives, but not all. There's certainly no limitation on it. So the fact that you have, what was it, on the part of 22 employees, the fact that all those shareholders were Alaska natives isn't particularly surprising. So from KIC's perspective, those six points that Mr. Becker made neither collectively nor individually are legitimately predicates for his understanding that he reasonably believes that the law was being violated. Correct, Your Honor. I think any belief there was unreasonable for the reasons stated. And so I think it's clear in the first place that the only opposition or protesting that Mr. Becker's brought to the table was about this policy. And the policy is neutral on its face. It's racially neutral on its face. It's a shareholder hiring preference. That's what the district court found. That's what courts looking at any kind of other similar hiring preferences have all lined up. So, again, then can he show that it was applied in a discriminatory manner? It certainly brought no evidence to the table that it was. The only evidence brought to the table were these three employees. We showed conclusively that, well, the preference simply did not apply. And then we come to your question. I'm still puzzling as to those three employees. I understand that the district court has found they did not qualify for shareholder preference. What I'm having trouble understanding is how Mr. Becker, and maybe this was the question on the other side, he viewed that as in his view. He thought they were subject to the shareholder preference. It turns out he's wrong. He then learns that they're not subject to the shareholder preference. Somehow he thinks that this is evidence that this is a native-only hiring policy. I don't get it. How is that evidence of a native-only hiring policy? He's wrong as to how they're classified, but how is that evidence of a native-only hiring policy, whether they're shareholders or not? Yeah, I don't get it either, Your Honor. And that's certainly why I don't think there was ever any reasonable belief because I don't think there is that connection there. Because they were Caucasians. Well, frankly, out of the three, one of them, Mr. Becker, says we're Caucasian. KIC's records show that he was a native Alaskan. We noted it in a footnote for the district court, but assumed for these purposes that he was Caucasian. So that would be Ronnie Moon. So since it didn't particularly matter whether he was or not, we were willing to, because he wasn't subject to the hiring preference, regardless, we were willing to say he was Caucasian for these purposes. Mr. Becker makes kind of a large issue on appeal about this being a hiring preference. Well, KIC never showed that there was a qualified shareholder applying for the same job that any one of these individuals was occupying. One, we certainly argue in the briefing before this court that that argument was waived. We first see this in his motion for reconsideration before the district court. This wasn't any evidence that was brought forth before. Two, we think it's immaterial at this point. He has failed to bring forth a prima facie case. The burden simply hasn't shifted to KIC to show that its reasons for terminating Mr. Becker, that it had legitimate business reasons, or that he had, in fact, not applied the policy correctly. And three, and I think most importantly, is there's more to implementation of the hiring preference than simply showing that, well, there were two applicants. I mean, implementing the hiring preference includes, amongst other things, keeping track of shareholder hiring statistics, and that's certainly evidence on the record that he failed to do that and led to some of the complaints from KIC's management. I'd say at this point that we have a facially neutral policy. We have a policy that Mr. Becker has not shown was applied in a discriminatory manner, and certainly our argument that he has absolutely no reasonable belief that KIC was using its shareholder policy as a proxy for race. As such, cannot show that he engaged in any protected activity, has failed to bring forth a prima facie case. Since we don't have race discrimination at play, really, this is removed from the amendment of 1981 altogether. Any opposition, it wasn't protected, it was merely subordinate. I think unless there are any further questions from the bench. I'm reading from Mr. Becker's first affidavit, paragraph 18. Four days after he's terminated, he's meeting with Mr., and I'm going to butcher the name, Mr. Tim Schertz in Anchorage. And Mr. Schertz, quote, told me, the real reason I was fired was that he was to be censured by the board of directors for my alleged noncompliance of the shareholder preference policy. Now, infer from that that Schertz is in trouble, and he then goes after Becker as a kind of scapegoat. Well, that sounds to me as though he is being punished, at least indirectly, for having not behaved properly with what KIC thought he was supposed to be doing, as though there is some form of retaliation. Well, sure, there would be retaliation any time somebody, an employee, a manager, came forward and had a policy in place that he wasn't implementing and that he kept badgering management about. Management gets fed up with it. And so, yeah, at some point you'll get terminated for that. The question is, was that policy unlawful? Was there racial discrimination? In this case, no. The whole question is whether he had any reason to believe that they were unlawful. You're saying he had no reason, but you say he has insufficient reason to believe. Correct. To the extent he's fired for not implementing that policy, if it doesn't involve racial discrimination, it's not under 1981, so it's not actionable retaliation. But the standard is not just whether it was actually unlawful, but whether he had a reasonable belief that it was actually unlawful. Sure, yes. So even though you may be able, on the second prong, if you get to that situation, show that that's not the problem with this policy. As long as he reasonably believed that it was unlawful, that's pretty what we're looking at here. Yeah, that's certainly the precedent in this court and other circuits, that even if the activity isn't lawful, if the person had a reasonable belief that it was. Thank you. Mr. Williams, could you put two minutes on the clock? Thank you, Your Honor. Let me just cut right to the chase. As concisely as you can, what reason did he have to believe that their hiring policy was discriminatory? Because the main issue was over his hiring of Keith, who was a Caucasian employee, and that was the main conflict. Right there in May 21st, that was the conflict that occurred. Why did you hire Keith? And it's this concept of what a hiring preference is. That's what his main question was. They're complaining or at least questioning his hiring of Keith. Tell me what that tells us about what reason he had to believe that they were following an illegal policy. He's hired Keith. They're questioning why you hired Keith. Perfectly legitimate question. Well, they're saying that he shouldn't have hired Keith. Well, where does it say you shouldn't have hired him? Well, that was what his affidavit doesn't say that, but that was in— Yeah, well, I want some evidence that says that they tell him he shouldn't have hired him, not related to the question. Well, that's what the question that he was receiving regarding Keith was. And the email correspondence that he had between himself and Sally Menton were regarding the hiring of Keith. But what he questioned was whether or not there were—the district court said he was insubordinate. He wasn't insubordinate because he never violated—that's where the question with him arose. He never violated their shareholder hiring preference because there was never a time when multiple people occurred. And so the only trigger that really emerged was the hiring of a Caucasian. And that's when he said, I need clarification on what this policy actually is. It seems like I'm getting marked down for hiring a Caucasian employee. But as far as the three other—where are they? The three other employees, those were really dealing with just record-keeping issues, not with the hiring preference. Okay, thank you very much. Thank you.
judges: Goodwin, Fletcher, Smith